**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Donna Siegel Moffa, Esquire
Lisa J. Rodriguez, Esquire
8 Kings Highway West
Haddonfield, NJ 08033
Telephone:  (856) 795-9002
Facsimile:  (856) 795-9887

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett, Esquire
Michael T. Fantini, Esquire
Russell D. Paul, Esquire
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604

Attorneys for Plaintiffs and the Class

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Jared Workman, and Mark and Mona Cohen, on behalf of themselves and all others similarly situated, | Civil Action No.  1:07-CV-01338 NLH-AMD |
| Plaintiffs, | **PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE WHY A PROTECTIVE ORDER TO SUPERVISE OR LIMIT COMMUNICATIONS WITH ABSENT CLASS MEMBERS SHOULD NOT ISSUE** |
| v. | |
| Menu Foods Limited, Menu Foods Inc., and Menu Foods Midwest Corporation | |
| Defendants. | **[Local Rule 65.1]** |

Dockets.Justia.com

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   ARGUMENT ............................................................................................ 3

     A.    Defendants' Attempt to Comply With Their Legal Obligations in
        Communicating With Absent Class Members Omits Crucial
        Information.......................................................................................... 3

     B.    Defendants' Revised Communication Must be Re-Sent to All
        Absent Class Members With Whom They Have Previously
        Communicated .................................................................................. 7

     C.    The Declaration in Defendants' Revised Claim Form Must be
        Removed............................................................................................. 7

     D.    Information Defendants Have Received As a Result of the Prior
        Improper Communication With Absent Class Members Must be
        Shared With Plaintiff........................................................................ 8

II    CONCLUSION ....................................................................................... 10

## I.    **INTRODUCTION**

At the time Plaintiffs filed their Emergency Order To Show Cause Why A Protective

Order To Supervise Or Limit Communications With Absent Class Members Should Not Issue

on May 7, 2007, Defendants, by their own admission, were engaged in the following

communications with absent class members:

1.  Defendants engaged a claims administration specialist – Crawford & Company
    ("Crawford") – to assist in communicating with pet owners who were affected by the
    Menu Foods pet food recall. (Defs. Br. at 3.) [1]

2.  Any pet owner who contacted Menu Foods was directed by Crawford to a specific web
    site – www.claimsalert.ca/menufoods ("claims alert web site) – that stated that "Menu
    will consider reimbursement for reasonable costs incurred" and included a link to a
    "claim form." (A copy of that web page is attached hereto as Exh. A). (Defs. Br. at 3-
    4).

3.  Defendants directly mailed Claim Forms to some callers, which they have stated
    numbered less than 50, and an untold number of potential class members have obtained
    the Claim Form through their website.(Defs. Br. at 3-4.)

Plaintiffs argued in their Order To Show Cause that Defendants' communications,

including the Claim Form used, were improper, misleading and coercive, and did not comply

with Defendants' legal obligations governing communications with absent class members.  Yet

interestingly, in response to Plaintiffs' Order to Show Cause, **Defendants now propose a**

**revised communication** with absent class members in their attempt to comply with their legal

obligations.  Plaintiffs condone these efforts, and believe the revisions go a long way towards

satisfying the legal obligations Plaintiffs brought to their attention. However, several pieces of

crucial information remain missing from Defendants' communication, and, as set forth below,

Plaintiffs request that this Court require this information to be added to Defendants'

communication.

---

[1] References to "Defs. Br. at ___" refer to Defendants' Brief in Response and Opposition to Plaintiffs' Motion to
Show Cause For a Protective Order.

In addition, Defendants' proposed revised letter to pet owners must not only be sent to every pet owner who contacts Menu Foods from this day forward, it must also be sent to all pet owners who previously contacted Menu Foods but who received the improper communication, either directly or through the claims alert web site that Defendants established.  Although Defendants' opposition implies that their previously distributed Claim Form was merely an innocent attempt to respond to consumers who directly contacted them, Menu Foods was not merely "responding to inquiries," but instead actively solicited those inquires through a massive media campaign.  This campaign most likely resulted in tens of thousands of consumers receiving the Claim Form at issue.

Specifically, on March 19, 2007, days following the recall, Menu Foods distributed a press release advising the public that it had substantially "enhanced the accuracy, comprehensiveness and user -friendliness of its website" and that consumers seeking information about the recall should visit www.menufoods.com/recall. (Exh. B attached)  383 newspapers throughout the United States picked up this press release and published the address of Defendants' website. Thereafter, more than *12.8 million different individuals* visited the Defendants' website that posted a toll-free number that consumers could call to inquire further about the recall. (*See* Neilsen Net Ratings attached as Exh. C)  Menu Foods admits that this generated "thousands of telephone calls" to its call center. (Defs. Br. at 3)  Consumers were then directed to the claims alert web site that linked to the Claim Form. (Exh. A)  It is unknown to Plaintiffs exactly how many of the 12.8 million individuals who visited Defendants' website downloaded the Claim Form or how many such Forms were filled out and returned.

Furthermore, all information received by Defendants as a result of the previously improper communications with absent class members should now be shared with Plaintiffs.

2

## II.   ARGUMENT

### A.   Defendants' Attempt to Comply With Their Legal Obligations in Communicating With Absent Class Members Omits Crucial Information

Plaintiffs have reviewed the proposed letter to pet owners drafted by Defendants, dated May 14, 2007 and attached to Defendants' Brief as Exhibit D. While Plaintiffs applaud Defendants' recent attempt to rectify many of the deficiencies in its communication with putative class members, which revisions occurred only after Plaintiffs filed their Order to Show Cause, numerous deficiencies still exist that raise serious questions about the appropriateness of their communication. Thus, judicial oversight of Defendants' communications with putative class members is still necessary because this revised communication continues to omit critical information that will likely mislead and specifically threaten the rights of potential class members in this litigation.

As explained in the Order to Show Cause, Plaintiffs do not dispute that generally defendants are entitled to send truthful, non-coercive communications to absent class members pre-certification, including offers of settlement. However, "[i]n view of the tension between the preference for class adjudication and the individual autonomy afforded by exclusion, it is critical that the class receive accurate and impartial information regarding the status, purposes and effects of the class action." *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1202 (11th Cir. 1985). Thus, this Court is authorized and bound to enter appropriate orders to protect the members of the class and to ensure the fair conduct of the class action. *See Georgine v. Amchem Products, Inc.*, 160 F.R.D. 478, 489 (E.D. Pa. 1995) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)). Such fair conduct of the class action obligates the court to ensure that "class members' decisions to participate or to withdraw be made on the basis of independent analysis of their own self interest." *Id.* at 490 (citations omitted). Indeed, "[w]hen

3

the court finds that the class action has been abused to the potential prejudice of class members, the court has full power to take appropriate remedial action to avoid or minimize any prejudice to the class." NEWBERG ON CLASS ACTIONS § 15:2 at 8 (4th ed. 2002).

As stated above, Defendants attached a revised Claim Packet to their opposition brief which they intend to use to communicate with putative class members to begin settling claims. *See* Defs. Br. at Ex. D. The revised Claim Packet will now include a cover letter that: (1) briefly describes the relevant pending class action lawsuits; (2) includes a list of attorneys who have filed an appearance before the Judicial Panel on Multidistrict Litigation in the related MDL proceedings; and (3) states that by entering into a settlement agreement with Defendants, the putative class member would be releasing any and all claims for damages the pet owner may have arising out of the Menu Foods recall, or relating to the injury or death of their pet. Again, while Defendants' should have included this very information in their prior communication with putative class members, Plaintiffs commend Defendants for their efforts to make their communication less misleading. Defendants' revisions to its communication, however, still prove to be inadequate in fully apprising putative class members of their legal rights.

Specifically, Defendants' revised communication omits a critical piece of information – namely that recipients of this letter are automatically a member of the class in the class actions currently pending and that they need not do anything else to protect their rights if they do not wish to settle directly with Menu Foods. While the proposed letter certainly advises recipients to contact an attorney if they have questions and supplies a full list of class counsel to contact, it leaves the impression that recipients only have two options – to settle directly with Menu Foods or affirmatively contact an attorney. Nevertheless, there exists a third option that Defendants

have omitted – that recipients need not do anything because they are automatically members of the class if their pets were harmed by Menu Foods' products during the proposed Class Period and will be automatically eligible for any recoveries awarded to the class, which may, in fact, be greater than any recoveries potentially offered directly by Menu Foods. *See In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1139 (7th Cir. 1979) ("The danger that the offer to settle individual claims would create is the possible misleading of class members about the strength and extent of their claims and the alternatives for obtaining satisfaction of those claims. Thus, an offer to settle should contain sufficient information to enable a class member to determine (1) whether to accept the offer to settle, (2) the effects of settling, and (3) **the available avenues for pursuing his claim if he does not settle**)." (emphasis added)

Thus, so that affected pet owners are fully informed of all their options, Plaintiffs request the following language be added in bold to Defendants' proposed letter so that the letter fully informs pet owners of all their options, is not misleading in any way and fully complies with the legal requirements of such communications:

> **As a pet owner whose pet may have been harmed by a recalled Menu Foods product, you are automatically a member of the class of plaintiffs who have brought actions against Menu Foods, and you do not need to do anything else to pursue your rights as a class member at this time. You are automatically eligible to receive a portion of any recoveries received by the class if a class is certified.**

Defendants' letter is also misleading by implying that once the Claim Form is filled out and returned, pet owners are locked in to settling directly with Defendants, no matter what the settlement offer is. To correct this, Plaintiffs propose the following additional language:

> **Returning the Claim Form will not preclude you from pursuing other available avenues at a later date in the event that you are not satisfied with Menu Foods' settlement offer. In addition, once you receive a settlement offer from Menu Foods, you should also feel free to contact an attorney for advice regarding the settlement offer.**

Plaintiffs direct the Court to Exhibit D attached hereto, which is a red-lined version of Defendants' proposed letter to pet owners that incorporates the two sentences above and also corrects some other, more minor misleading impressions in the current draft.

Indeed, incomplete communications can be just as misleading as affirmative falsehoods. *See Georgine*, 160 F.R.D. at 492, 494-496. Given the absence of crucial information from Defendant's revised communication, as described above, putative class members will likely be confused as to their legal rights upon submitting the proposed revised Claim Packet. Many putative class members will likely be misled into believing that settling with Defendants or affirmatively directly contacting an attorney are their only viable options at this time. As the Third Circuit explained, it is not only "[a] district court's duty and authority under Rule 23(d) to protect the integrity of the class and the administration of justice generally . . . [against] communications that mislead or otherwise threaten to create confusion and to influence the threshold decision whether to remain in the class," but also against "communications that seek or threaten to influence [a] choice of remedies." *In re School Asbestos Litig.*, 842 F.2d 671, 683 (3d Cir. 1988).

Here, as evidenced above, Defendants' misleading communication hinders what the Court is obligated to protect, *i.e.* - the ability of purported class members to make an informed and independent choice of whether to settle directly with Defendants or do nothing and remain a member of the class. Accordingly, Plaintiffs respectfully request that the Court order Defendants to revise their proposed letter to pet owners in a manner consistent with Plaintiffs' red-lined version of that letter that is attached hereto as Exhibit D.

**B.     Defendants' Revised Communication Must Be Re-Sent to All Absent Class Members With Whom They Have Previously Communicated**

Defendants state that "Menu Foods has prepared and intends to send out a settlement notice to claimants who have communicated with Menu Foods." (Defs. Br. at 10.)  It is unclear whether this means that Defendants will send the revised Claim Form with the new cover letter to all the many pet owners who have previously contacted Menu Foods and who were sent the previous improper communication or who were directed to the claims alert web site that also contained incomplete information.  Plaintiffs believe that, at a minimum, the revised communication must be sent to everyone who received the previous improper communication, to the extent those pet owners can now be identified.

**C.     The Declaration in Defendants' Revised Claim Form Must Be Removed**

Defendants have revised their Claim Form and have added a Declaration at the end before the signature line, which reads as follows:

**DECLARATION**

I certify under penalty of perjury that the information provided above is true and correct and that the submission of false information may subject me to civil and/or criminal penalties.

I acknowledge receipt and review [sic] the letter from Menu Foods which explains the effects of settling and lists other available avenues to pursue my claim, including the pending class actions. Despite these other avenues, I would like to proceed with settling my claim with Menu Foods.

This declaration is improper for several reasons.  First, it states that the cover letter "lists other available avenues to pursue my claims," which falsely implies that **all** other avenues were listed, when in fact the option of doing nothing and proceeding as a member of the putative class is not listed.

Second, the language "I would like to proceed with settling my claim with Menu Foods," in effect, turns this Claim Form into an unauthorized solicitation to opt out. *See In re*

7

*General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1140 (7ᵗʰ Cir. 1979) (citing to Manual for Complex Litigation § 1.41 at 27 (condemning unauthorized solicitations to opt-out)). This language falsely implies that once the Form is signed, a pet owner is obligated to proceed with settling with Defendants, no matter what the proposed terms of such settlement will be. Pet owners may not understand that they have the right to turn down any proposed settlement and continue as members of the class.

In addition, putative class member may be harmed if Defendants are allowed to claim that this ambiguous language operates as an opt out, despite the fact that the solicitation used to obtain it was unauthorized and misleading. *See Georgine*, 160 F.R.D. at 498 ("courts have recognized that the extent of harm resulting from a campaign to solicit opt-outs 'cannot be quantified with any precision,' and hence 'the Court must make its best estimate, taking into account the likely effect of the solicitation program based on its nature.'" (quoting *Kleiner v. First Nat. Bank of Atlanta*, 102 F.R.D. 754, 772 (D. Ga. 1983)).

**D.    Information Defendants Have Received As a Result of the Prior Improper Communication With Absent Class Members Must Be Shared With Plaintiffs**

Defendants may have received perhaps tens of thousands of Claim Forms as a result of their well-known product recall web site (that received 12.8 million hits) that directed pet owners to call a toll-free number where operators then directed them to a claims alert web site that included a link to the previous improper Claim Form. Plaintiffs do not know (i) exactly how many of the 12.8 million individuals who visited Defendants' website actually downloaded the Claim Form, (ii) how many Claim Forms were filled out and returned to Defendants, (iii) how many pet food consumers sent Defendants evidence and other information needed to

8

substantiate their claims against Defendants, or (iv) exactly what "data" and/or physical evidence Defendants have obtained from these individuals.

Although Defendants have attempted to correct their communications with absent class members and have done so after Plaintiffs brought the issue to the attention of the Court through this Emergency Order to Show Cause, Defendants have likely received relevant information, data, evidence and other materials directly as a result of their prior, improper communications. This information was not properly received, but nevertheless Defendants may improperly attempt to use this information for litigation purposes. Because it directly relates to the claims made by Plaintiffs in this litigation, as a matter of equity all of this information and these materials should be shared with Plaintiffs and the class.

## III.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court enter an order requiring Defendants to add to their letter to affected pet owners the sentences set forth above and in the red-lined version of Defendants' letter (Exh. D attached), to eliminate the misleading Declaration from the Claim Form, to re-send the proposed letter to all pet owners with whom Defendants have previously communicated, and to share with Plaintiffs all information in, and materials received in conjunction with, the prior Menu Foods Claim Form.

Dated:  May 17, 2007                         Respectfully submitted,

                                             By:_____/s Lisa J. Rodriguez_____
                                                        Lisa J. Rodriguez

                                             Donna Siegel Moffa, Esquire
                                             **TRUJILLO RODRIGUEZ & RICHARDS, LLC**
                                             8 Kings Highway West
                                             Haddonfield, NJ 08033
                                             Telephone:  (856) 795-9002
                                             Facsimile:  (856) 795-9887

                                             Sherrie R. Savett, Esquire
                                             Michael T. Fantini, Esquire
                                             Russell D. Paul, Esquire
                                             **BERGER & MONTAGUE, P.C.**
                                             1622 Locust Street
                                             Philadelphia, PA 19103
                                             Telephone: (215) 875-3000
                                             Facsimile: (215) 875-4604

                                             *Attorneys for Plaintiff and the Class*

# EXHIBIT A

## This site is for informational purposes regarding Menu Foods

If your pet's illness (death) is found to be as a result of consuming Menu manufactured pet food subject to the recall then Menu will consider reimbursement for reasonable costs incurred.

### What should I do if I think my pet may have consumed the recalled product?

If your pet is exhibiting any signs of kidney failure please contact your veterinarian as soon as possible. Cats and dogs with kidney failure often drink more water than usual and produce more urine. As the problem progresses, animals may appear depressed, vomit, have ulcers in their mouths, and develop a urine-like odor to their breath. The recall is limited to cuts and gravy style pet food in cans and pouches manufactured at two of the Fund's United States facilities, and affects 40 brands of cat food, and 48 brands of dog food produced between December 3, 2006, and March 6, 2007. In order to determine whether your pet consumed cat or dog food that is subject to recall, you should refer to the list of brand names at www.menufoods.com/recall.

If you suspect that you have fed the recalled pet food to your cat or dog, save the remaining pet food and container. Open containers may be double-bagged in sealable plastic and kept in the freezer. If you believe that your pet may have been injured or died after eating the recalled product, please call to submit information regarding the injury or loss.

To download the claim form please click here

If you are unable to open the claim form please download Adobe Acrobat Reader©

# EXHIBIT B

**PRESS RELEASE**

| | | |
|---|---|---|
| **MENU FOODS INCOME FUND** | **Menu Foods Income Fund** | |
| | TSX:          MEW.UN          Stock Quote   Stock Chart | |
| | Other Recent News | |

March 19, 2007

## Enhanced Website and Call Center for Precautionary Recall of Dog and Cat Food by Menu Foods Income Fund

TORONTO, ONTARIO--(CCNMatthews - March 19, 2007) -

Attention Business/Financial Editors:

NOT FOR RELEASE OVER US NEWSWIRE SERVICES

In order to better respond to the needs of its customers, Menu Foods Income Fund (the "Fund") (TSX:MEW.UN) has enhanced the accuracy, comprehensiveness and user-friendliness of its website focused on its recent recall of dog and cat food. The Fund is encouraging consumers to check back with the website regularly, to get the most up-to-date information available. Furthermore, the Fund has enhanced its call center capabilities to better respond to consumers.

The Fund announced on March 16 the precautionary recall of a portion of the dog and cat food it manufactured between December 3, 2006 and March 6, 2007. The recall is limited to "cuts and gravy" style pet food in cans and pouches manufactured at two of the Fund's United States facilities. These products are both manufactured and sold under private-label and are contract-manufactured for some national brands.

Consumers can find the latest information at www.menufoods.com/recall. The website contains detailed information on the products subject to recall, together with updated dates of production and links to related recalls.

**CONTACT INFORMATION**

Menu Foods Income Fund
Consumers
1-866-895-2708
Website: www.menufoods.com

# EXHIBIT C

Return to Release

**Pet Food Contamination Drives Concerned Consumers to the Web; U.S. Traffic to Pet Food Sites up 115 Percent in March, According to Nielsen//NetRatings**

**Largest Increase in Pet-Related Web Traffic Among Visitors 55+**

# Nielsen//NetRatings
NEW YORK, NY – (MARKET WIRE) – 05/14/2007 – Nielsen//NetRatings (NASDAQ: NTRT), a global leader in Internet media and market research, announced today that Web traffic to pet-related sites grew 115 percent in March over the previous month, from 9.1 million unique visitors to 19.5 million. Menu Foods, North America's largest pet food supplier, announced a product recall on March 16th after receiving complaints in the United States about renal failure in pets who had consumed the food. Pet owners flocked online to find out which products were affected – MenuFoods.com fell below reporting cutoff in February, but drew a remarkable 12.8 million unique visitors in March (see Table 1).

Whereas Menu Foods was virtually unknown to pet food consumers before the recall, already-trusted household brands also saw significant growth to their Web sites in March. IAMS.com went from below reporting cutoff in February to 2.4 million unique visitors in March, and Purina grew 30 percent from a unique audience of 1.5 million to 2.0 million. Traffic to pet information and retail sites also experienced strong growth.

"Consumers have come to rely on company Web sites to provide them with up-to-date information on their products and services, especially in urgent situations," said Michael Pond, media analyst, Nielsen//NetRatings. "From Jet Blue's 'Passenger Bill of Rights' to 'Iams Promise,' businesses are leveraging their online presence to communicate directly with customers and re-establish trust after a crisis. This is especially important for companies that rely on brand recognition and brand loyalty; for them, engaging consumers in an online conversation is a critical step in recovering from a serious misstep."

Table 1: Top 10 Pet-Related Web Sites for March 2007 (U.S., Home and Work)

| Site | Feb-07 Unique Audience (000) | Mar-07 Unique Audience (000) | Percent Growth |
|------|------------------------------|------------------------------|----------------|
| Pet Food Roll-Up | 9,077 | 19,539 | 115% |
| menufoods.com | N/A | 12,838 | N/A |
| Petfinder.com | 2,654 | 2,911 | 10% |
| IAMS | N/A | 2,376 | N/A |
| PetSmart | 1,948 | 2,368 | 22% |
| Purina | 1,548 | 2,013 | 30% |
| PETCO.com | 911 | 1,206 | 32% |
| dogbreedinfo.com | 895 | 1,154 | 29% |
| 1800petmeds.com | 878 | 1,140 | 30% |
| akc.org | 1,077 | 1,121 | 4% |
| Next Day Pets | 768 | 838 | 9% |

Source: Nielsen//NetRatings Custom Analysis, May 2007

Seniors' Online Behavior Most Affected by March Pet Food Recall

Among demographic groups, visitors age 55 and older saw the largest increase in unique audience composition percent among pet-related Web sites, growing 5.3 percentage points from 20.7 percent of the audience roll-up in February to 26.0 percent in March. Seniors who otherwise might not have visited pet-related Web sites were motivated to go online to find out the latest recall information. Increases in audience composition were also seen among middleclass households with an income between $50,000-$75,000 and among men; these groups grew 3.7 and 3.6 percentage points in March, respectively.

Pet Food Search Terms

"Pet food recall" was the most popular pet food search term with 1.4 million search queries in March; it was the 75th most popular search term overall (see Table 2). "Dog food recall" and "Menu Foods" were the second and third most popular pet food search terms, with 1.2 million and 485,000 search queries, respectively. Total pet food-related search queries for the month (among the top 5,000 search terms) totaled 4.9 million.

"Nearly five million search queries related to the pet food recall demonstrate how heavily consumers rely on search providers for gathering critical information," said Pond. "In addition to providing easily accessible content on their own Web sites, companies who want to communicate with their customers during a crisis should also consider buying relevant key words to drive traffic to

the right place."

Table 2: Top Pet Food Search Terms for March 2007 (U.S.)

| Search Term | Searches (000) |
|---|---|
| pet food recall | 1,386 |
| dog food recall | 1,182 |
| menu foods | 485 |
| www.menufoods.com/recall | 319 |
| menufoods.com | 291 |
| cat food recall | 284 |
| menufoods.com/recall | 207 |
| purina | 197 |
| dog food | 167 |
| www.menufoods.com | 162 |

Source: Nielsen//NetRatings MegaView Search Custom Analysis, May 2007

Nielsen//NetRatings reports April 2007 data for the Top Sites by Parent Company and Top Brands. In addition, Nielsen//NetRatings reveals the Top Advertisers by Company for April 2007.

Nielsen//NetRatings Top 10 Web Sites by Parent Company and
Top 10 Web Sites by Brand, April 2007

Table 1. Top 10 Parent Companies, Combined Home & Work

Table 2. Top 10 Brands, Combined Home & Work

| | Parent | Unique Audience (000) | Time Per Person (hh:mm:ss) | | Brand | Unique Audience (000) | Time Per Person (hh:mm:ss) |
|---|---|---|---|---|---|---|---|
| 1. | Microsoft | 118,451 | 2:02:21 | 1. | Google | 110,805 | 1:07:55 |
| 2. | Google | 115,887 | 1:26:11 | 2. | Yahoo! | 106,701 | 3:04:39 |
| 3. | Yahoo! | 107,539 | 3:03:59 | 3. | Microsoft | 96,579 | 0:41:10 |
| 4. | Time Warner | 103,737 | 4:17:24 | 4. | MSN/Windows Live | 94,766 | 1:50:52 |
| 5. | News Corp. Online | 73,590 | 1:50:39 | 5. | AOL Media Network | 93,506 | 4:27:12 |
| 6. | eBay | 68,588 | 1:47:57 | 6. | Fox Interactive Media | 65,289 | 1:57:41 |
| 7. | InterActiveCorp | 59,417 | 0:27:05 | 7. | eBay | 61,764 | 1:47:35 |
| 8. | Amazon | 48,035 | 0:25:14 | 8. | YouTube | 46,436 | 0:42:40 |
| 9. | Wikimedia Foundation | 46,117 | 0:15:42 | 9. | Wikipedia | 45,934 | 0:15:40 |
| 10. | Landmark Communications | 45,025 | 0:45:31 | 10. | Apple | 44,031 | 1:06:52 |

Example: The data indicates that 45.0 million home and work Internet users visited at least one of the Landmark Communications-owned sites or launched a Landmark Communications-owned application during the month, and each person spent, on average, a total of 45 minutes and 31 seconds at one or more of their sites or applications.

A parent company is defined as a consolidation of multiple domains and URLs owned by a single entity. A brand is defined as a consolidation of multiple domains and URLs that has a consistent collection of branded content.

Nielsen//NetRatings AdRelevance Top 10 Advertisers, April 2007

Top advertisers, ranked by estimated spending, are based on data from AdRelevance, Nielsen//NetRatings' advertising research service. An impression is counted as the number of times an ad is rendered for viewing.

Top 10 Advertisers by Estimated Spending

| Advertiser | Total Estimated | Impressions |
|---|---|---|

Market Wire News                                                                                      Page 3 of 3

|     |                                   | Spending      | (000)      |
| --- | --------------------------------- | ------------- | ---------- |
| 1.  | Experian Group Limited            | $70,308,100   | 28,532,734 |
| 2.  | InterActiveCorp                   | $60,688,000   | 17,903,403 |
| 3.  | NexTag, Inc.                      | $58,981,300   | 29,159,834 |
| 4.  | Low Rate Source                   | $33,374,100   | 15,266,721 |
| 5.  | Netflix, Inc.                     | $24,826,000   | 5,384,642  |
| 6.  | Verizon Communications, Inc.      | $19,308,000   | 4,181,594  |
| 7.  | Countrywide Financial             |               |            |
|     | Corporation                       | $18,319,300   | 9,001,475  |
| 8.  | AT&T Corp.                        | $15,896,400   | 4,144,470  |
| 9.  | Monster Worldwide, Inc.           | $12,523,200   | 3,104,502  |
| 10. | Ford Motor Company                | $12,445,500   | 2,061,840  |

Estimated spending reflects CPM-based advertising online, and excludes search-based advertising, paid fee services, performance-based campaigns, sponsorships, barters, partnership advertising, advertorials, promotions and e-mail. Impressions reported exclude house ads, which are ads that run on an advertiser's own or related property and co-branding relationships.

Example: An estimated 2.1 billion Ford Motor Company ads were rendered for viewing at the cost of approximately $12.4 million during the surfing period.

About Nielsen//NetRatings

NetRatings, Inc. (NASDAQ: NTRT) delivers leading Internet media and market research solutions, marketed globally under the Nielsen//NetRatings brand. With high quality, technology-driven products and services, Nielsen//NetRatings is the global standard for Internet audience measurement and premier source for online advertising intelligence, enabling clients to make informed business decisions regarding their Internet and digital strategies. The Nielsen//NetRatings portfolio includes panel-based and site-centric Internet audience measurement services, online advertising intelligence, user lifestyle and demographic data, e-commerce and transaction metrics, and custom data, research and analysis. For more information, please visit www.nielsen-netratings.com.

Editor's Note: Please source all data to Nielsen//NetRatings.

Contact:
NetRatings, Inc.
Suzy Bausch
(408) 941-2965

Return to Release

# EXHIBIT D

Dear Pet Owner:

Thank you for taking the time to contact our call center regarding your claim. We are sympathetic to your situation, and offer our apologies for any difficulties that you have experienced related to Menu Foods recall. While we remain committed to resolving your claim quickly, we feel it necessary to advise you of the effects of entering into a settlement with Menu Foods, as well as to inform you of other avenues which are available to pursue your claim. We do not intend to offer you legal advice, but rather to present you with sufficient information so that you may make an informed decision. If you have any legal questions, including what your available legal rights might be, please feel free to contact an attorney.

As you may know, numerous class action lawsuits have been filed throughout the United States and in Canada by consumers who each seek to represent the interests of pet owners, likes yourself, who claim that their cats and/or dogs have been injured or died as a result of eating one of Menu Foods' products. The cases are likely to be coordinated or consolidated in a single federal court within the next two months by the authority of a federal judicial panel called the Judicial Panel on Multidistrict Litigation . All cases that will be part of this likely coordination or consolidation are part of what is referred to as *In re Pet Food Products Liability Litigation*, MDL No. 1850. A list of attorneys representing consumers in MDL No. 1850, including their contact information, is attached to this letter. Further, other manufacturers, including Nestle, Purina, Sunshine Mills, Del Monte, Diamond Pet Food, Royal Canine, and SmartPac also have recalled products. Please be sure that this claim relates to pet food manufactured by Menu Foods. For additional information regarding the recalled pet foods, please see http://www.fda.gov/oc/opacom/hottopics/petood.html.

It remains Menu Foods' desire to address any reasonable expense incurred by pet owners that we can identify as being caused by contamination of Menu Foods' products. Any mutually agreeable settlement of your claim would require you to accept Menu Foods' determination of what is a reasonable expense and to sign a settlement agreement that would release any and all claims for any injury or economic harm you may have arising out of the recall and/or related to the injury and/or death of your pet. We wish to advise you that you have the option of contacting any attorney, including one of the attorneys on the attached list, and pursuing your claim in that fashion. If you have any questions regarding the full extent of your rights, we suggest that you speak to an attorney. As a pet owner whose pet may have been harmed by a recalled Menu Foods product, you are automatically a member of the class of plaintiffs who have brought actions against Menu Foods, and you do not need to do anything else to pursue your rights as a class member at this time. You are automatically eligible to receive a portion of any recoveries received by the class if a class is certified.

If you wish at this time to begin the settlement process directly with Menu Foods rather than pursue other available avenues, we ask that you complete, sign and return the enclosed claim form. Returning the Claim Form will not preclude you from pursuing other available avenues at a later date in the event that you are not satisfied with Menu

Foods' settlement offer.  In addition, once you receive a settlement offer from Menu Foods you should also feel free to contact an attorney for advice regarding the settlement offer.  Subject to any court order, which would prevent Menu Foods from proceeding with the settlement contemplated herein, we will proceed with the settlement process.  Please continue to check Menu Foods' website for further developments and updates in this matter.  We sincerely hope that we are able to work together to bring this matter to a prompt conclusion.